E-FILED
Monday, 11 December, 2017  06:20:34 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| FRAN WATKINS,<br>　　　　　　Plaintiff,<br>　　　v.<br>RIVERSIDE MEDICAL CENTER -<br>RIVERSIDE SENIOR LIVING CENTER,<br>　　　　　Defendants. | Case No. 16-CV-2252<br>District Judge Colin S. Bruce<br>Magistrate Judge Eric Long |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

Plaintiff, Ms. Fran Watkins, by her attorney, Mitchell A. Kline, pursuant to

Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1 (D), hereby responds to the

motion for summary judgment filed by Defendants, Riverside Medical Center and Riverside Senior

Living Center, as follows.

## INTRODUCTION

Plaintiff, Ms. Fran Watkins, is African-American. In October 2008, Defendants hired Ms.

Watkins as a personal care assistant ("PCA"); and Ms. Watkins continued to work for Defendants

for six years.  In 2014, she worked as a Certified Nurse's Assistant at Defendant's Memory Care

unit at the Senior Center when Ms. Diane Marek became her supervisor. Ms. Marek held the

position of Memory Care and Assisted Living Nurse Manager at Riverside.

In approximately August 2014, Ms. Marek began calling Plaintiff "Trouble" in front of

other employees; each time Plaintiff saw Ms. Marek, Ms. Marek would say, "Are you staying out

of trouble?"; and Ms. Marek did not call any white employees "Trouble".

On October 1, 2014, Plaintiff had been holding resident Irene Watt's arm for

balance as they were walking down the hallway from her resident apartment. While Defendants'

videotape of this incident illustrated that Ms. Watkins conduct was very professional, based on

incorrect information, Ms. Marek fired her based on this incident.   Based on the following

evidence and law, Plaintiff will show that Defendants' decision to terminate Ms. Watkins was

based on race discrimination and that prior to Ms. Watkins' termination she was force to work in

a racially hostile environment.

## 1.   UNDISPUTED MATERIAL FACTS

**Watkins's Employment at Riverside**

1.      Riverside is an integrated health care facility located in Kankakee, Illinois.

(Marek Dec. ¶ 6.) Riverside is an employer within the meaning of Title VII and Section 1981,

and federal court jurisdiction and venue within the United States District Court for the Central

District of Illinois are proper. (ECF No. 26, Answer to Am. Compl. ¶¶ 4, 5.)

       ANSWER: Admit

2.      Riverside Senior Life Communities offers, among other facilities, assisted living

apartments for individuals in need of memory care (referred to as Riverside Senior Life

Communities - Assisted Living and Memory Care and also a skilled nursing facility called

Riverside Miller Rehabilitation Center ("Miller")). Many of the patients who live in the Memory

Care facility suffer from dementia and Alzheimer's disease. (Marek Dec. ¶ 6; Pl. Dep. 29:19.)

       ANSWER: Admit

3.      In October 2008, Riverside hired Watkins as a personal care assistant ("PCA")

reporting to Nurse Manager Cookie Longtin (White). (Pl. Dep. 26:18-20, 27:1-21.)

       ANSWER: Admit

4

4.       As a PCA, Watkins was responsible for assisting residents with their activities of daily living, including cleaning residents' rooms, escorting residents to meals and assisting them with phone calls, recreation and toileting. (Pl. Dep. 28:12-29.)

ANSWER: Admit

5.       Riverside's Memory Care unit employs the Resident-Centered model of care. (Marek Dec. ¶ 10.) It is therefore crucial that CNAs in Memory Care empower the residents and respect their autonomy. (Marek Dec. ¶ 10, Ex. A; Koehler Dec. ¶ 8, Ex. C.) CNAs are to give residents the opportunity for self-determination in their care and respect their wishes and decisions. (Marek Dec. ¶ 10.)

ANSWER: Admit.

6.       In 2010, Watkins began working in Memory Care. (Pl. Dep. 29:7-6.)

ANSWER: Admit.

7.       Watkins performed the duties of a PCA in Memory Care until her termination from Riverside on or about October 13, 2014 (Pl. Dep. 29:4-6, 30:2-13); however, at the time of Watkins's discharge, her title had changed from PCA to CNA, or certified nurse's assistant (*Id.* at 30:14-3.)

ANSWER**:** Admit

**Riverside's Policies**

8.       At all times relevant, Riverside maintained an equal employment opportunity policy, which states that Riverside is committed to providing equal employment opportunities, as required by law. (Koehler Dec. ¶ 5, Ex. A.) The policy strictly prohibits discrimination on the basis of race, color or any other protected characteristic in accordance with all applicable laws. (Koehler Dec. ¶ 5, Ex. A.) The policy also contains specific mechanisms by which an employee may report violations of the policy, and it prohibits retaliation of any kind for reporting or assisting in the investigation of a complaint. (Koehler Dec. ¶ 5, Ex. A.)

ANSWER: Admit

9.      Riverside also maintains an Employee Conduct and Work Rules Policy that

prohibits unlawful or unwelcome harassment. (Koehler Dec. ¶ 6, Ex. B.)

ANSWER: Admit

5

10.     Watkins understood that any complaints of harassment could be made to Riverside Human Resources or to Jean Koehler, the Employment and Employee Relations Manager. (Pl. Dep. 46:6-22.)

ANSWER: Admit

11.     At all times relevant, Riverside also maintained a policy designed to protect its residents from harm. (Marek Dec. ¶ 11, Ex. B.) The Abuse and Neglect Policy prohibits corporal punishment, physical abuse and mental injury to residents. (Marek Dec. ¶ 11, Ex. B.) Employees who engage in resident abuse or mistreatment are subject to discipline, up to and including termination of employment. (Koehler Dec. ¶ 7, Ex. B.)

ANSWER: Admit

12.     During her employment at Riverside, Watkins understood that abuse or ill treatment of a resident could result in termination of employment. (Pl. Dep. 37:12-16.)

ANSWER: Admit

13.     During her employment at Riverside, Watkins underwent training on Riverside's Abuse and Neglect Policy more than 10 times each year, and she understood that the following conduct could be considered abuse: slapping a resident's hand; pulling a resident's arm; telling a resident to "shut up"; and yelling at a resident. (Pl. Dep 39:2-40:14.)

ANSWER: Admit

14.     In approximately February of 2014, Watkins also received training on the Code of Behavior Policy in effect at Riverside. (Pl. Dep. 44:21-45:6.) Watkins signed an acknowledgment that this Code of Behavior Policy was in effect during her employment at Riverside, and she admitted she read and understood it. (Pl. Dep. 44:21-45:6.)

ANSWER: Admit

**Watkins's Job Performance at Riverside**

<u>Watkins's Corrective Action Reports</u>

15.     On or about July 29, 2012, Watkins's supervisor issued Watkins a Corrective

Action Report because Watkins co-signed paperwork indicating that she delivered a pill pack to a

resident, but no pill pack was delivered from the pharmacy so that the resident went without his

or her medication. (Pl. Dep. 47:1-48:14, Ex. 9.) Watkins does not dispute that the pill pack was

not delivered to the resident. (*Id.* at 49:4-9.)

ANSWER: Admit

16.     On or about January 25, 2013, Watkins signed a Corrective Action Report, stating

that a resident complained that Watkins did not check on him, empty his garbage or pick up his

towels. (Pl. Dep. 51:3-52:13, Ex. 10.) Watkins does not remember this incident, but does not

dispute that she signed the Corrective Action Report. (*Id.*)

ANSWER: Admit

17.     On February 25, 2013, Watkins's supervisor issued Watkins a Corrective Action

Report, stating that Watkins missed a medication reminder for a resident on February 19, 2013,

but signed that the medication had been given. (Pl. Dep. 53:19-54:23, Ex. 11.) Watkins disputes

that she missed a medication reminder for this resident. (Id. at 55:12-56:16.)

ANSWER: Admit

Watkins's January 2014 Treatment of a Resident

18.     On or about January 17, 2014, Watkins assisted Resident A,[3] who was elderly and

suffering from dementia. (Pl. Dep. 62:16-20, 63:7-14, 67:19, 68:8, 80:13-17; Tierney Dec. ¶ 4;

Marek Dec. ¶ 31, Ex. F.)

ANSWER: Admit

19.     Resident A's daughter asked Watkins to take her mother to the restroom because

Resident A was trying to urinate in the fireplace of the day room. (Pl. Dep. 62:16-20, 63:22-

64:1.) Watkins assisted with getting Resident A to the restroom and tried to pull up Resident A's

pants, which upset Resident A. (*Id.* at 62:21-24.)

ANSWER: Admit

20.     After Watkins assisted Resident A to the restroom, Watkins tried to help Resident

A sit down, and Resident A started screaming. (*Id.* at 63:1-3.) At that point, Resident A's

daughter opened the door and tried to calm her mother down. (Pl. Dep. 63:3-5.)

ANSWER: Admit

[3] To protect the privacy of its residents, Riverside refers to the residents involved in this matter as Resident A, Resident B, Resident C and Resident D and does not provide the residents' initials or names. Further, the initials and names of residents and their family members have also been redacted from the exhibits filed in support of Riverside's motion for summary judgment.

7

21.     Around this time, a Licensed Practical Nurse ("LPN"), Lorely Taylor (Asian), asked Resident A's daughter what was going on and why her mother was hollering. (Pl. Dep. 52:15-22, 53:13-15, 64:13-20.) The daughter responded that Watkins was in the restroom with her mother. (Pl. Dep. 65:4-7.) Watkins then pulled up Resident A's underwear and let her out of the restroom. (Pl. Dep. 65:8-11.) After Resident A came out of the restroom, she was upset. (Pl. Dep. 65:12-16.)

    ANSWER: Admit

22.     That same day, Watkins was involved in another incident with Resident A. (Pl. Dep. 67:19-68:8, 72:23-73:7, Ex. 12.) Watkins was sitting at a dining room table with Resident A, her daughter, another resident and other family members, when Resident A walked around the table and put her hand in another family member's food. (Pl. Dep. 68:14-69:11.)

    ANSWER: Admit.

23.     Watkins intervened to escort Resident A back to the other end of the table. (Pl. Dep. 69:11-19.) When Watkins guided Resident A to sit back down, Resident A started screaming, and Taylor yelled, "what [is] going on?" (Pl. Dep. 70:4-13.) Watkins then calmed everyone down, and they finished dinner. (Pl. Dep. 70:14-24.)

    **ANSWER**: Admit

24.     On or about January 21, 2014, Watkins met with her supervisor, Cassie Haase (White), and Haase's supervisor, Executive Director Ellen Tierney (White), about the incidents with Resident A. (Pl. Dep. 60:9-15, 71:13-72:14, 77:13-78:1; Marek Dep. 7:14.)

    **ANSWER**: Admit

25.     During this meeting, Haase and Tierney told Watkins that Taylor reported that Watkins did not handle the situation correctly. (Pl. Dep. 74:18-22.) Watkins responded that she took Resident A to the restroom at her daughter's request, Resident A has been verbally abusive and tried to kick her and Taylor was screaming. (Pl. Dep. 75:1-9.)

**ANSWER**: Admit

26.     During this meeting, Haase asked Watkins if she grabbed Resident A's arm and

pulled her away when Resident A put her hand in a visitor's food. (Pl. Dep. 81:18-24.) Watkins

8

responded, "no" and said she was "just trying to protect [the visitor] from [Resident A]." (Pl. Dep. 81:18-24.)

>    **ANSWER**: Admit.

>    28. Tierney also recalls that they told Watkins that if she is ever in a position where she feels uncomfortable, then she needs to call for help. (Tierney Decl. ¶ 5.)

>    ANSWER: Admit.

>    29.    Watkins denies that Tierney and Haase counseled her on these issues. (Pl. Dep. 82:13-83:20, 84:1-12.)

>    **ANSWER**: Admit

>    30.    Watkins did not receive any discipline as a result of these incidents because Tierney and Haase determined that while it was inappropriate, Watkins's conduct did not rise to the level of resident abuse or violate the Abuse and Neglect Policy. (Pl. Dep. 84:13-85:2; Tierney Decl. ¶ 5.)

>    **ANSWER:** Admit

**Watkins's Discharge from Riverside for Resident Abuse**

> Watkins Begins Reporting to Nurse Manager Diane Marek

>    31.    From March 17, 2014 through March 20, 2016, Diane Marek (White) held the position of Memory Care and Assisted Living Nurse Manager at Riverside. (Marek Decl. ¶ 4; Marek Dep. 7:7-10, 14:8-11.)

>    **ANSWER**: Admit

>    32.     In this role, with respect to Registered Nurses ("RNs"), LPNs and CNAs, Marek was responsible for scheduling, delegating resident assignments among staff members, quality monitoring, presenting at quality meetings, addressing the staff's educational needs and handling

9

resident, family and staff concerns. (Marek Dep. 6:12-15, 8:2-9:7, 13:18-21; Pl. Dep. 32:15-33:8;

Marek Dep. 6:12-15.)

**ANSWER**: Admit.

33. At the time of her discharge, Watkins was working the second shift, from 2:30

p.m. to 11:00 p.m., and Marek worked the first shift, from 8:00 a.m. to 5:00 p.m. (Pl. Dep. 33:13-

19, 35:6-10; Marek Dec. ¶ 5.)

**ANSWER**: Admit

October 2014 Allegations of Resident Abuse

34. On September 30 or October 1, 2014, Watkins went into the room of Resident B,

an elderly resident with dementia, to get her to come out to dinner, and Resident B agreed. (Pl.

Dep. 86:11-22, 87:2-3, 88:4-6.) As Watkins and Resident B headed down the hallway, Resident

B started leaning back, saying "no." (Pl. Dep. 86:3-6.) Watkins was holding Resident B's arm.

(Pl. Dep. 87:6-8.)

ANSWER: Admit

35. At that point, another CNA, Virginia Perhach (White), walked around the corner

and asked Watkins if she would like assistance, and Watkins responded, "yes." (Pl. Dep. 21:9-

11, 87:14-15.) According to Watkins, Perhach then walked Resident B to the dining room. (Pl.

Dep. 87:15-17.)

ANSWER: Admit

36. Later that night, Watkins checked on Resident B, who had smeared feces on her

pajamas. (Pl. Dep. 89:9-23.) Watkins washed Resident B and changed her pajamas, and Resident

B cooperated. (Pl. Dep. 90:1-2.)

ANSWER: Admit

37. After Watkins left Resident B's room, Resident B came out into the hallway and

said that she ought to shoot Watkins, started crying and then went back in her room and slammed

the door. (Pl. Dep. 90:3-6, 91:3-23.) Perhach came out of the office, which was about 20-30 feet

away. (Pl. Dep. 90:9-22, 91.)

ANSWER: Admit.

10

38.     On October 2, 2014, either Perhach or a Dietary Aide, Nicole Rzyski (White), reported to Marek that there was an incident between Watkins and Resident B, where Watkins was trying to get Resident B to come down to the dining room and there was a lot of commotion. (Marek Dep. 33:9-19.)

ANSWER: Admit

40. During the interview, Perhach also told Marek that on October 1, 2014, she heard Resident B upset and crying. (Marek Dec. ¶ 14, Ex.  C.) Perhach told Marek she went into  Resident B's room to try to console her, and Resident B told her to "fix my door," stating that  Resident B "locked it but she still got in." (Marek Dec. ¶ 14, Ex. C.) Perhach told Marek that  when she asked Resident B who got in, the resident said, "She hit me." (Marek Dec. ¶ 14, Ex. C.)

ANSWER: Admit.

41.     On October 2, 2014, Marek also interviewed Dietary Aide Nicole Rzyski about the alleged incident between Watkins and Resident B. (Marek Decl. ¶ 15, Ex. C.) During the interview, Rzyski told Marek that on October 1, 2014, she heard Watkins in the room of another resident, Resident C, using a loud and aggressive voice to try to get the resident to change her clothes. (Marek Dec. ¶ 15, Ex. C.) Rzyski stated she then saw Watkins close the resident's door,

11

presumably because the resident was resisting the care Watkins was trying to provide her. (Marek Dec. ¶ 15, Ex. C.)

ANSWER: Admit.

42.     On October 2, 2014, Marek met with Watkins and Memory Care Specialist Terri Genson (White) (Koehler Decl. ¶ 10), in Marek's office and informed Watkins that she was being investigated for resident abuse allegations (Pl. Dep. 86:7-10, 93:19-23, 95:12-98:2). In response, Watkins denied the allegations. (Pl. Dep. 98:9-99:22.)

ANSWER: Admit.

43.     At the end of the meeting on October 2, 2014, pursuant to Section 6.d. of the Riverside Abuse and Neglect Policy, Marek notified Watkins that her employment was suspended pending investigation of the abuse allegations and gave her a written notice of her suspension. (Pl. Dep. 98:9-99:22, 100:7-101:17, Ex. 14; Marek Dep. 31:12-32:22; Marek Dec. ¶ 17.)

ANSWER: Admit

44.     On October 2, 2014, Marek prepared a written Initial Report of Investigation regarding the allegations, which included a summary of Perhach's and Rzyski's statements, which she faxed to the Illinois Department of Public Health ("IDPH") that same day, per state law mandates. (Marek Dec. ¶ 16, Ex. C.)

ANSWER: Admit.

45.     On October 2, 2014, Marek also reviewed silent security camera footage of the hallway incident between Watkins and Resident B. (Marek Dep. 35:19-16, 42:14-17, 44:4-6.) On the footage, Watkins was holding Resident B's arm, it appeared that Resident B was getting upset about something, and Resident B pulled her arm back, away from Watkins. (Marek Dep. 37:19-38:7, 42:14-17.) Next, the footage showed Perhach coming out of the kitchen and assisting Resident B back to her room. (Marek Dep. 37:24-38:14, 40:15-23.)

ANSWER: Admit.

46.     Finally, on October 2, 2014, Marek spoke to Nora O'Gorman, the Administrator

of the Miller facility, about assisting Marek with the investigation of the resident abuse

12

allegations against Watkins because Marek was scheduled to attend professional education classes out of the office in Lisle, Illinois on October 3, 2014. (Marek Dec. ¶ 18; Marek Dep. 61:20-62:13; Pl. Dep. 86:2-6.)

ANSWER: Admit.

47.    During their conversation, Marek told O'Gorman what she had heard from Perhach and Rzyski about Watkins's alleged abuse of Resident B. (Marek Dec. ¶ 19.) O'Gorman told Marek she would interview relevant staff members to find out whether anyone else had witnessed these incidents. (*Id.*)

ANSWER: Admit

51.    At some point, O'Gorman and Marek called Watkins on the phone and asked her if she had abused Resident A and if she had scrubbed another resident really hard in the shower, and Watkins told them "no." (Pl. Dep. 101:18-103:1, 104:15-16.) They also told Watkins that they were going to conduct an investigation with her coworkers to see what had been going on and that they would be in touch. (Pl. Dep. 103:2-15.)

ANSWER: Admit.

52.    Subsequently, someone from the Riverside human resources department called  Watkins and asked her to come in and bring her statement. (Pl. Dep. 103:18-104:7.)

ANSWER: Admit

53.    On October 8, 2014, Watkins met with O'Gorman, Marek and Koehler at Riverside and brought them a copy of her written statement regarding her conduct towards Resident B. (Pl. Dep. 104:8-105:24, 109:6-10, Ex. 15.) During the meeting, Watkins told Marek,

14

O'Gorman and Koehler her account of what happened with Resident B, and she denied that she was physically or verbally abusive towards residents. (Pl. Dep. 106:12-107:10, 110:19-21.)

ANSWER: Admit.

54.     At some point during the investigation of these allegations against Watkins, Marek reviewed the investigation file related to Watkins that was in her office and learned of the January 2014 allegation regarding Watkins's treatment of Resident A, including the counseling that Tierney recalls having provided to Watkins. (Marek Dec. ¶ 31, Ex. F; Tierney Dec. ¶ 5.)

ANSWER: Admit

55.     Shortly after she conducted her interviews, O'Gorman submitted a written report of her findings to Marek. (Marek Dec. ¶ 27, Ex. D; Marek Dep. 27:2-15.) Attached to the report were handwritten statements from Virginia Perhach, Rzyski, Smothers and Deathrage, confirming the information they previously provided to O'Gorman and Marek. (Marek Dec. ¶ 27, Ex. E.)

ANSWER: Admit.

57.     Marek reviewed O'Gorman's findings and the attached statements, and they appeared to Marek to be trustworthy and consistent with the verbal reports that had been made to her by Perhach and Rzyski on October 2, 2014, as well as her previous discussions with O'Gorman regarding the investigation. (Marek Dec. ¶ 27.)

ANSWER: Plaintiff has no knowledge of this fact.

58.     Based on the information Marek learned directly from Perhach and Rzyski, O'Gorman's interviews, the written statements from other staff members, including the report

that a staff member saw Watkins smack a resident's hand, and that Watkins had already been

investigated in January 2014 before Marek was at Riverside, Marek concluded that Watkins

violated Riverside's Abuse and Neglect Policy and that it was in the best interests of the

residents that Watkins no longer work at Riverside. (Marek Dep. 56:22-57:9, Marek Dec. ¶ 32.)

Accordingly, Marek decided to terminate Watkins's employment. (Marek Dep. 23:5-17; Marek

Dec. ¶ 33.)

ANSWER: Admit.

59.  On October 9, 2014, Marek faxed to the IDPH a follow-up report of the

investigation findings, stating that Riverside had found Watkins committed verbal/physical

abuse. (Marek Dec. ¶ 36.)

ANSWER: Admit

60.    Watkins's employment was terminated effective October 13, 2014. (Pl. Dep.

129:13-17; Koehler Decl. ¶ 9, Ex. D.)

ANSWER: Admit

61.    Watkins was replaced by Lakethia Mack, a CNA whom Marek hired. (Marek

Dec. ¶ 39; Norvell Dec. ¶ 4, Ex. A; ECF No. 26, Answer to Am. Compl. ¶ 20.) Marek perceived

Mack to be African-American. (Marek Dec. ¶ 39.)

ANSWER: Denied. The following testimony of Plaintiff indicates that she was replaced

by Virginia Perhach, who is white:

A. When Marek hired Virginia and Mike back after I got terminated, she specified
that Mike could not work in Memory Care with his wife anymore.

Q. Just to describe that time period when  Virginia and Michael, they had
been working for Riverside, they left supposedly for a better life, … and then
a few weeks later they returned to work at Riverside?

A. Yes

Q. …I believe you said a three-week period -- it was during that three-week

period from the time that they left, before the time they returned to work?

A. Yes.

(Watkins Dep. 234:24, 235:1-2, 19-24, 237:3-7).

<u>Watkins's Post-Discharge Visit to Riverside</u>

62.     Sometime during the week of Watkins's discharge, Watkins went back to

Riverside to get her belongings out of her locker. (Pl. Dep. 129:24-130:9.)

ANSWER: Admit.

63.     When Watkins arrived at Riverside, she came through the front door, and the

receptionist called Tierney and Marek. (Pl. Dep. 130:13-22.) Tierney went back to her office. (Pl.

Dep. 130:13-22.) Marek escorted Watkins to retrieve her things from her locker. (Pl. Dep.

130:13-22.)

ANSWER: Admit

16

64.     When Watkins came out of the locker area, Marek instructed Watkins to leave through the back door, and Watkins told her that she parked in front and would leave through the front door. (Pl. Dep. 23:3-117, 131:1-8.)

ANSWER: Admit

65.     As Watkins left, she waved to a resident, and Marek told her to "keep moving," "keep walking" and "don't talk to anybody, just keep moving" because Marek did not want Watkins to disrupt the residents during lunch or cause a scene. (Pl. Dep. 131:9-19; Marek Dec. ¶ 38.) Watkins then tried to stop and speak to the receptionist, and Marek told her to "keep walking" and that Marek did not "want to have to call security." (Pl. Dep. 131:20-24.)

ANSWER: Admit

66.     At that point, Watkins left the building and had no further contact with Marek. (Pl. Dep. 132:1-8.)

ANSWER: Admit

**Watkins's Hostile Work Environment Allegations**

67.     Watkins testified that Marek, Virginia Perhach and Lorely Taylor created a racially hostile work environment at Riverside. (Pl. Dep. 20:5-23.) No one else created a racially hostile work environment for Watkins. (Pl. Dep. 20:24-21:3.)

ANSWER: Admit

Allegations Relating to Diane Marek

68.     Marek called Watkins "trouble" on a daily basis and asked her repeatedly, "Are you staying out of trouble?" (Pl. Dep. 22:3-12, 154:12-155:7.) Watkins did not see Marek call anyone else "trouble." (Pl. Dep. 156:1-8.)

ANSWER: Admit

69. Watkins testified that the name "Trouble" is related to her race as follows:

Q.      Why do you believe her calling you trouble was based on your race?
A.      That's from my -- from my understanding, that's what is -- that's what white

people refer to black people when they think that they are, I would say, lazy. It's a -- it's a slur, a slur.

Q.    Who told you that?

17

A.      I'm 58 -- 59 years old, and this isn't the first time I've seen people treated this way.

Q.      Okay. So it's your testimony that calling somebody trouble is a racial slur?

A.      Yes.

(Pl. Dep. at 155:13-24.)

ANSWER: Admit

70.      As the Nurse Manager, Marek asked Watkins and other employees who were non-African American if he or she were "staying out of trouble." (Marek Dec. ¶ 40) Marek has never intended for this phrase to be racially charged in any way. (*Id.*)

ANSWER: Denied based on the following testimony of Plaintiff:

Q.      Is there any other reason you believe it was based on your race?

A.      I didn't see her calling anybody else that…

(Watkins dep. 156: 1-3).

71.      Watkins testified that Marek also created a racially hostile work environment because "everyone," including Watkins's White and African-American coworkers, appeared to be upset, talked about how Marek did not know what she was doing, and Marek did not support the nurses and "left a lot of stress" on them. (Pl. Dep. 161:7-162:8.)

ANSWER: Admit.

72.      Marek did not say anything to Watkins or anyone else that Watkins believed was racial in nature, and Marek made no other comments that Watkins found offensive. (Pl. Dep. 162:9-15, 170:17-19.)

ANSWER: Denied based on the following testimony of Plaintiff:

Q.      Why do you believe her calling you trouble was based on your race?

A.      That's from my -- from my understanding, that's what is -- that's what white people refer to black people when they think that they are, I would say, lazy. It's a-- it's a slur, a slur.

Q.      Who told you that?

A.      I'm 58 -- 59 years old, and this isn't the first time I've seen people treated this way.

Q.      Okay. So it's your testimony that calling somebody trouble is a racial slur?

A.    Yes.

Q.    Is there any other reason you believe it was based on your race?

A.    I didn't see her calling anybody else that…

(Watkins Dep. at 155:13-24,156:1-3.)

73.    Watkins did not complain to Riverside's Human Resources department about

Marek, and she did not ever report to anyone at Riverside that Marek called her trouble. (Pl. Dep.

180:3-7.)

ANSWER: Admit.

<u>Allegations Relating to Virginia Perhach</u>

74.    Watkins testified that Perhach created a hostile work environment by: calling

Watkins's residents' families to discuss the residents' progress; telling them things that she

should be making Watkins aware of so that it looked like Watkins did not know how to deal with

certain situations; being "on top of it" when residents in Watkins's care were agitated or had

doctor's appointments; discussing issues with residents' families that should have gone through

the nurses and/or Watkins; not following the "chain of command"; and making it look like

Watkins did not know how to do her job. (Pl. Dep. 162:20-163:14, 166:24-167:4.)

ANSWER: Admit.

75.    Watkins believes Perhach "bad-mouthed" her to Chelsea Smothers, Nicole Rzyski

and Lorely Taylor, but Watkins was not present for any such conversations and no one ever told

her that Perhach bad-mouthed her. (Pl. Dep. 164:12-166:5.)

ANSWER: Admit

76.    Watkins also testified that Perhach changed the schedule so that she could work

with White employees. (Pl. Dep. 167:5-23.)

ANSWER: Admit

77.    Watkins also testified that, although only one staff person was supposed to sit at

each table, Perhach had everybody sit at her table in the dining room to isolate Watkins. (Pl.

Dep. 168:3-17.)

ANSWER: Admit.

78. Perhach never made any comments to Watkins about her race. (Pl. Dep. 170:12-

13.)
ANSWER: Admit

79.    Watkins complained about Perhach to her previous supervisors, Cookie Longtin

and Katrina Schabacker, in 2011 and 2013, respectively. (Pl. Dep. 180:10-181:10.) Specifically,

Watkins reported that Perhach was overbearing, documenting on Watkins's residents in the

group book, showering residents without Watkins's permission and communicating with the

residents' families without Watkins's permission. (Pl. Dep. 180:21-182:6.)

ANSWER: Admit

80.    Watkins did not complain about Perhach to anyone else at Riverside. (Pl. Dep.

182:7-10.)

ANSWER: Admit.

Allegations Relating to Lorely Taylor

81.     Watkins testified that Taylor created a hostile work environment because she

would talk to Perhach about residents instead of speaking to Watkins. (Pl. Dep. 168:20-169:3.)


    ANSWER: Admit

82.     Watkins believes Taylor's alleged actions are related to race because: it appeared
Taylor thought Perhach could handle things better than Watkins; Taylor rarely spoke to Watkins
about her residents; and "maybe" Taylor thought Watkins would not understand, but Taylor
never said that to Watkins. (Pl. Dep. 169:13-170:8.)

ANSWER: Admit

83. Taylor never made any comments to Watkins about her race. (Pl. Dep. 170:9-11.)

ANSWER: Admit

84. Watkins did not complain about Taylor to anyone at Riverside. (Pl. Dep. 182:11-
13.)

ANSWER: Admit

85.     Watkins did not complain about racial harassment to anyone at Riverside. (Pl.
Dep. 182:14-183:21.

ANSWER: Admit

Watkins's Applications to Riverside Hospital

86.     During her employment at Riverside, Watkins applied for seven different
positions at Riverside Hospital, outside of Memory Care, because she did not want to work with
Virginia Perhach. (ECF No. 22, Am. Compl. ¶ 10; Pl. Dep. 170:20-171:6.)

ANSWER: Admit

87.     Between February 24, 2014 and August 9, 2014, Watkins applied for the
following positions at Riverside Hospital: CNA/MST - 4 Rehab; CNA - 3 Telemetry; CNA/MST
- 4 Rehab; ER Tech; CNA/MST - 4 Rehab; Rehab Tech - IP; and CNA/MST - 5 Med/Surg. (Pl.
Dep. 172:24-176:17, Ex. 20.)

ANSWER: Admit

88.     Riverside Hospital did not hire Watkins for any of these positions. (Pl. Dep.
176:15-17.)

ANSWER: Admit

89.     Watkins does not know who made the hiring decisions or who was hired for any

of the seven positions to which she applied, but she knows that a White person was hired for one

of the CNA positions. (Pl. Dep. 174:4-177:11.)

ANSWER: Admit

20

90.     Watkins testified that Cassie Haase and Marek told her that she could not leave Memory Care because no one else wanted to work in Memory Care and she could not be replaced. (Pl. Dep. 177:12-21, 179:21-24.)

ANSWER: Admit

91.     No one from Riverside Hospital ever asked Marek to release Watkins for a position at Riverside Hospital or informed her that the Hospital was considering hiring Watkins for a position. (Marek Dec. ¶ 41.)

ANSWER: Admit

92.     Marek did not deny Watkins any transfer out of Memory Care. (Marek Dec. ¶ 41.) Marek does not and has not ever made hiring decisions for Riverside Hospital. (*Id*.)

ANSWER: Admit.

**Watkins's Race Discrimination Claims**

93.     Watkins alleges that Riverside discriminated against her based on her race by denying her transfers out of Memory Care, accusing her of resident abuse and terminating her employment, although her Amended Complaint does not allege that Riverside discriminated against her by denying her transfers out of Memory Care. (Pl. Dep. 21:15-24:8; ECF No. 22, Am. Compl. ¶ 10.)

ANSWER: Admit

94.     Watkins believes her discharge was based on race because: Marek did not like her; Marek saw the security footage of her and Resident B in the hallway; Virginia and Michael Perhach resigned from Riverside for a better life and were rehired after Watkins's discharge; and Watkins's coworkers, including Perhach, Taylor, Rzyski and "Choa" all sat at a dining table together and would not talk to Watkins. (Pl. Dep. 133:2-135:15.)

ANSWER: Admit.

95.     O'Gorman, Tierney, Koehler, Virginia Perhach, Michael Perhach, Taylor, Rzyski, Choa, Smothers and Deathrage have not made any comments to Watkins relating to her race. (Pl. Dep. 135:16-137:23, 142:24-143:17.)

ANSWER: Admit.

21

96.     Watkins has no reason to believe that Tierney or O'Gorman is biased against African Americans. (Pl. Dep. 142:24-143:17.)

ANSWER: Admit.

Watkins's Alleged Comparators

97.     Watkins testified that Riverside treated a CNA, Ashley Whittaker (White), more favorably than her because in June 2014, Watkins reported to Terri Genson that Whittaker left residents in their beds wet or allowed them to walk around wet. (Pl. Dep. 148:15-23, 148:7-22.) Genson told Watkins that she would speak with Whittaker, but Watkins does not know what, if any, actions Genson took in response to Watkins's report. (Pl. Dep. 149:7-150:20.)

ANSWER: Admit

98.     No one, including Watkins, ever reported to Marek that Whittaker left residents in their beds wet or allowed them to walk around wet, and Marek has never witnessed or observed Whittaker doing so. (Marek Dec. ¶ 46.) Marek is not aware of such allegations against Whittaker. (Marek Decl.  ¶ 46.)

ANSWER: Admit.

99.     Watkins testified that Riverside treated Lorely Taylor better than her because Taylor got away with "hollering" at residents. (Pl. Dep. 150:21-151:3.) Watkins never reported to anyone that Taylor was hollering at residents. (Pl. Dep. 151:4-6.)

ANSWER: Admit.

100.    No one, including Watkins, ever reported to Marek that Taylor hollered, yelled or raised her voice at residents, and Marek has never witnessed Taylor doing so. (Marek Dec. ¶ 47.) Marek is not aware of any such allegations against Taylor. (Marek Dec. *Id*.)

ANSWER: Admit.

101.    Watkins testified that Riverside treated Chelsea Smothers better than her because in 2013, Smothers missed giving residents medication. (Pl. Dep. 151:12-23.) Watkins's reported

Smothers's alleged error to Smothers's supervisor, Katrina Schabacker. (Pl. Dep. 151:24-152:7.)

Watkins does not know whether the supervisor took any action in response to Watkins's report.

(Pl. Dep. 152:4-11.)

ANSWER: Admit

22

102.     Watkins testified that Riverside treated another CNA, Natalie Mesewicz (White), better than her because numerous coworkers reported Mesewicz for leaving residents in their beds wet. (Pl. Dep. 147:9-24, 152:19-23.) Specifically, sometime in 2014, Watkins reported the issue to Mesewicz's team leader, Denise (African American), but Watkins does not know what Denise did in response to Watkins's report. (Pl. Dep. 152:24-153:19.)

ANSWER: Admit

103.     No one, including Watkins, ever reported to Marek that Mesewicz left residents in their beds wet, and Marek has never witnessed or observed Mesewicz doing so. (Marek Decl.  ¶ 45.) Marek is not aware of such allegations against Mesewicz. (Marek Dec. *Id.*)

ANSWER: Admit.

104.     In her Amended Complaint, Watkins also alleges that Riverside treated Mesewicz more favorably because she was accused of patient abuse and not discharged. (ECF No. 22, Am. Compl. ¶ 20.)

ANSWER: Admit

105.     During Marek's time as Nurse Manager for Assisted Living and Memory Care, a resident made an allegation of abuse against Mesewicz. (Marek Dec. ¶ 42, Ex. H.) Marek was not present at the facility when this allegation was made or when the alleged incident occurred. (Marek Dec. ¶ 42; Marek Dep. 17:13-19, 20:5-8, Ex. 4.) Nora O'Gorman addressed the matter in Marek's absence and suspended Mesewicz pending investigation. (Marek Dep. 17:13-19; Marek Dec. ¶ 42, Ex. H.) O'Gorman also faxed the allegation report to the IDPH. (Marek Dec. ¶ 42, Ex, H.)

ANSWER: Admit.

106.     Riverside's investigation revealed Mesewicz accidentally hit a resident's wheelchair against the door. (Marek Decl. ¶¶ 43, 44, Ex. H.) Given that Mesewicz's conduct was accidental, Riverside did not find that Mesewicz engaged in resident abuse and did not terminate

her employment. (Marek Dec. ¶ 44, Ex. H.) The resident reported to Riverside that she was

satisfied with the results of the investigation. (*Id.*)

ANSWER: Admit.

23

107.    Marek did not participate in any decisions surrounding the outcome of the Mesewicz investigation, and she did not decide whether to discharge or retain Mesewicz. (Marek Dec. 42; Marek Dep. 20:9-11.)

ANSWER: Admit.

## 2. DISPUTED MATERIAL FACTS

27. Tierney recalls that during this meeting, she and Haase counseled Watkins about  the importance of adhering to Riverside's abuse policy, remaining calm and having patience with  residents and always showing professional behavior toward all residents, staff and visitors.   (Tierney Decl. ¶ 5; Pl. Dep. 82:13-83:20.)

**ANSWER**: Denied.

Q. …Do you recall Ellen and Cassie meeting with you and discussing the importance of remaining calm and patient with residents?

A. No. (Watkins Dep. 20:23)

39.    On October 2, 2014, Marek interviewed Perhach about the alleged incident between Watkins and Resident B. (Marek Decl. ¶ 13.) During the interview, Perhach told Marek that on or about September 30, 2014, Perhach witnessed Watkins pull Resident B's arm as she led her down the hallway at the Memory Care facility. (Marek Dec. ¶ 13, Ex. C.) Perhach also told Marek that she was in the hall when Resident B appeared to not want to go to the dining room for meal time. (Marek Dec. ¶ 13, Ex. C.) Perhach also told Marek she could see Resident B resisting, Watkins aggressively pulling Resident B down the hall, and then Resident B broke free from Watkins and ran back to her room. (Marek Dec. ¶ 13, Ex. C.)

ANSWER: Denied.  Ms. Marek was asked the following questions during her deposition and answered as follows:

Q.  So, just to clarify, you described what you saw [on the video tape] regarding Irene and Fran, and we've also referred to you saw Virginia coming out of a door?

A. Yes.

Q.  So, as best as you can recall, did she [Virginia] come out of the door before or after Irene had  pulled her arm -- I believe you said Irene pulled her arm away from Fran?

A. It was after.

Q.  … you described on the footage that  you saw where Irene was very close to Fran and  Irene had pulled her arm away from Fran, is that  correct?

A. I didn't say that she was close to Fran. They were walking down the hall together, and Irene -- you could see Irene pull her arm away from Fran.

Q.  So, at that point could you see where Virginia was?

A. No. I seen her come out the door after Irene was turning around to go back to her room.

Q.  So, regarding the footage that we've been describing from that day regarding Irene and Fran and Virginia…besides what you've described, was there anything else that you observed?

A. No.

 (Marek Dep. 40:15-23, 43: 9-12,15-18, 20-23, 24, 44: 1-2, 7-9, 11)


48. On October 2, 2014, O'Gorman interviewed Perhach. (Marek Dec. ¶ 20, Ex. D.)

Around this time, O'Gorman also verbally reported to Marek the substance of her

interview with  Perhach. (Marek Dec. ¶ 20; Marek Dep. 27:2-15;) O'Gorman told

Marek that Perhach stated the  following:

- Perhach was in the kitchen area and she heard Watkins talking loudly and witnessed her pull Resident B down the hallway;

- Perhach immediately went to Watkins and told her she would help Resident B back to her room, and Watkins agreed and left the area;

- Resident B told Perhach that Watkins had hurt her the night before and asked Perhach to lock the door because she did not want Watkins in her room;

- Perhach recalled that Resident B had been very upset after Watkins changed her clothing on the evening of September 30, 2014, so Perhach  sat with Resident B until the end of her shift; and

- Perhach often took care of Watkins's residents so Watkins would be less frustrated.

(Marek Dec. ¶ 20, Ex. D.)

ANSWER: Denied. The following testimony of Ms. Marek, regarding what the video showed, illustrates that Ms. Perach was not truthful when she alleged she saw misconduct:

> Q.  So, just to clarify, you described what you saw regarding Irene and Fran, and we've also referred to you saw Virginia coming out of a door?
>
> A. Yes.
>
> Q.  So, as best as you can recall, did she come out of the door before or after Irene had  pulled her arm -- I believe you said Irene pulled her arm away from Fran?
>
> A. It was after.
>
> (Marek Dep. 40: 15-23).

### 3.  DISPUTED IMMATERIAL FACTS

49. On October 2, 2014, O'Gorman interviewed Christa Deathrage, a Riverside  Dietary Aide. (Marek Dec. ¶ 21, Ex. D.) Around this time, O'Gorman also verbally reported to  Marek the substance of her interview with Deathrage. (Marek Decl. ¶ 21.) O'Gorman told Marek  that Deathrage stated the following:

- Deathrage had seen Watkins yell at another resident, Resident D, to "shut up" and had turned the television up to "drown out" the resident's talking; and

- Deathrage approached Watkins and told her that Resident D had a tendency to repeat statements but that Watkins did not respond to Deathrage.

(Marek Decl. ¶ 21 & Exhibit D.)

> ANSWER: First, this alleged fact is not admissible because it is hearsay: Ms. Marek is stating what Ms. O'Gorman told her regarding what Ms. Christa Deathrage had told Ms. O'Gorman in a conversation. Second, it is not relevant because, even assuming this statement was not hearsay, Ms. Deathrage has not stated that she was present to observe what Ms. Marek saw on the video regarding Ms. Watkins' alleged misconduct.

50. On October 8, 2014, O'Gorman interviewed Chelsea Smothers, a Riverside CNA at the time, and verbally reported the substance of her interview to Marek. (Marek Dec. ¶ 26 & Exhibit D.) O'Gorman told Marek that Smothers stated the following:

- Smothers observed Watkins become impatient and raise her voice when speaking to residents;

- Smothers witnessed an incident with Resident A, where Resident A became agitated with Watkins after dinner and began to hit and swing at Watkins, and Watkins became frustrated with Resident A in response, smacked her hand and said, "don't hit me" to Resident A;

- Staff often took care of Watkins's assigned residents when Watkins appeared impatient or the resident was agitated.

(Marek Decl. ¶ 26, Ex. D.)

> ANSWER: Denied. First, this alleged fact is not admissible because it is hearsay: Ms. Marek is stating what Ms. O'Gorman told her regarding what Ms. Chelsea Smothers had told Ms. O'Gorman in a conversation. Second, it is not relevant because, even assuming this statement was not hearsay, Ms. Smothers has not stated that she was present to observe what Ms. Marek saw on the video regarding Ms. Watkins' alleged misconduct.

**4. UNDISPUTED IMMATERIAL FACT**

56.  Michael Perhach, a former CNA, also submitted a statement stating that on  September 30, 2014, he saw Resident B crying near the office one night in Memory Care.  (Marek Dec. ¶ 29, Ex. E.) The statement stated he consoled Resident B, and she kept repeating,  "They hit me" and "They killed me." (*Id.*) M. Perhach indicated Resident B had been  periodically resistant to care but had never cried profusely. (*Id.*) The statement stated Watkins  had been in the office during this time and appeared indifferent.

ANSWER: The comments Resident B allegedly made are hearsay. In addition, Mr. Perhach's statement is immaterial because he did not observe the alleged misconduct that Ms. Marek observed on video.

## 5. PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS WHICH SUPPORT THE DENIAL OF SUMMARY JUDGMENT

108.    At Plaintiff's deposition, she was asked the following questions and responded as follows:

Q.    Are there any other actions that the defendants took against you that you are alleging were based on your race?

A.    Yes.

A.    Diane [Marek] would call me trouble.

Q.    Okay. Any other actions that defendants took against you that you believe were based on race?

A.    Yes. When I was walking my residents out  of programs, Diane would often see me with them and say, are you staying out of trouble?

(Watkins Dep. 22:3-7,12-17).

Q.    Why do you believe her calling you trouble was based on your race?

A.    That's from my -- from my understanding, that's what is -- that's what white people refer to black people when they think that they are, I would say, lazy. It's a-- it's a slur, a slur.

Q.    Who told you that?

A.    I'm 58 -- 59 years old, and this isn't the first time I've seen people treated this way.

Q.      Okay. So it's your testimony that calling somebody trouble is a racial slur?

A.      Yes.

Q.      Is there any other reason you believe it was based on your race?

A.      I didn't see her calling anybody else that…

A.      … I do know that she did not have a good rapport with African Americans.

Q.      Okay. Why do you say she didn't have a good rapport with African Americans?

A.      Because… -- we would talk, and some of them told me how she treated them.

Q.      …and Tina Hudson is African…American

A.      Yes.

Q.      When did Tina Hudson speak to you about Ms. Marek?

A.      During her employment there all the time.

Q.      Okay. What did she tell you about Ms. Marek?

A.      That she hollered at -- hollered at her, she talked down to her.

(Watkins Dep. at 155:13-24,156:1-3,22-24, 157: 1-4, 10-17).


109.  As stated in Fact number 108, Ms. Watkins testified that the word "trouble" is a racial slur  based on her understanding of what white people refer to black people when they think they are lazy. In a 2012 article in the  *National Review* written by Jack Fowler, he refers to a comment made by New Hampshire Governor John Sununu made concerning President Barack Obama in which Sununu stated that the President was lazy. In his article Fowler quoted a *Hartford Courant* columnist, Frank Harris. Harris wrote:

> [Sununu] … delivered a blow way below the belt and far across the racial line …
> In his smug delivery Sununu clearly knew what it meant to call someone black-the
> president no less-lazy. It is one of those racial stereotypes so often used over the
> years for Americans of African descent. (Exhibit 2, *National Review* article by Jack
> Article dates October 11, 2012)

110. Matt Lee, a student at Elon University, published an article titled "The Manipulation

and Role of Stereotypes in the Rush Hour Trilogy". Mr. Lee states:

> Most of the stereotypes in the film are suggested through dialogue and behavior… For example in Rush Hour 2, Lee [who is an Asian character in the movie] is able to run on a truck to avoid getting hit while Carter [who is black] rolls along the truck because he does not have kung-fu skills. This behavior, though comedic through the editing, portrays Lee as a skilled karate hero and accentuates Carter's reputation as the loud-mouthed, trouble-making sidekick… African -Americans received many positive and negative stereotypes in the Trilogy. [Carter's] character, with his loud talking and trouble-making nature, only perpetuated the stereotypical happy-go-lucky Negro of early 1900s Hollywood films.  (Exhibit 3, *Elon Journal of Undergraduate Research in Communications,* Vol. 7, No 2, Fall 2016)

111.    Regarding the video Diane Marek saw concerning Ms. Watkins' alleged misconduct, Ms. Marek was asked the following questions during her deposition and provided the following answers:

> Q.  As far as what you described [in the video] as Irene and Fran walking down the hall, did you notice anything unusual as you observed them walking down the hall?
>
> A.  Yes.
>
> Q. What did you observe?
>
> A. Fran had Irene's arm which that didn't -- that wasn't necessarily alarming, but as they were walking down the hall, you could tell that Irene was getting upset about something. I didn't know what, but you could tell she was getting upset, and then, she pulled her arm back…
>
> Q. So, when you observed Irene pulling her arm back, are you talking about Irene pulling her arm back or was it Fran's arm?
>
> A. No. It appeared like Fran was helping her down the hall and Irene pulled her arm away from Fran.
>
> Q. So, as far as Fran's conduct as it related to what you were reviewing with Irene, was there anything in addition to what you've already stated that you observed regarding Fran's conduct?
>
> A. No.
>
> Q. So, in October of 2014, you viewed footage of Irene pulling her arm away from Fran, is that correct?
>
> A. Yes.
>
> Q. At any time after October 2014, did you again look at that footage?
>
> A. I looked at the footage several times.
>
> (Marek Dep. 37: 12-14, 16, 18-24, 38:2-7, 15-19, 42:14-20).

112.   Regarding the video Ms. Marek saw concerning where Ms. Perhach was at the time of Ms. Watkins' alleged misconduct, Ms. Marek was asked the following questions during her deposition and provided the following answers:

Q.  So, just to clarify, you described what you saw regarding Irene and Fran, and we've also referred to you saw Virginia coming out of a door?

A. Yes.

Q.  So, as best as you can recall, did she come out of the door before or after Irene had  pulled her arm -- I believe you said Irene pulled her arm away from Fran?

A. It was after.
Q.  … you described on the footage that  you saw where Irene was very close to Fran and  Irene had pulled her arm away from Fran, is that  correct?

A. I didn't say that she was close to Fran. They were walking down the hall together, and Irene -- you could see Irene pull her arm away from Fran.

Q.  So, at that point could you see where Virginia was?

A. No. I seen her come out the door after Irene was turning around to go back to her room.

Q.  So, regarding the footage that we've been describing from that day regarding Irene and Fran and Virginia…besides what you've described, was there anything else that you observed?

A. No. (Marek Dep. 40:15-23, 43: 9-12,15-18, 20-23, 24, 44: 1-2, 7-9, 11).

113.      M. Vicki Little, a co-worker of Plaintiff, stated the following in her Certification of Statement:

… I worked with Fran Watkins as a Licensed Practice Nurse (LPN) at Riverside Senior Living Center (Riverside) from the beginning of March 2014 through May 2014. At least 2-3 times per week, I saw Ms. Watkins work with the eldercare residents and admired how she treated them. Ms. Watkins spoke so gently to them, never raising her voice. She was always very attentive to her patient's needs…
I was terminated by Ms. Marek in May 2014 because of my African American race. Ms. Marek said the reason for termination was because I made a medication error. I attempted to give a patient her meds but the patient was in the washroom. I told the patient I would come back at the end of the shift but I forgot. The patient was fine. In March 2014, Lorali (last name unknown), [who is] White, …, gave a patient the wrong medication. Lorali made sure to tell me in training that the appropriate procedure was to report the error, which she did. Lorali was never given any discipline for her med error. Exhibit 1, Ms. Little's statement.

114.   Plaintiff was asked and answered the following questions regarding her white co-worker, Natalie Mesovich:

Q. What about Natalie Mesovich? Why do you believe she was treated better than you?

A.  Numerous co-workers reported Natalie for leaving residents wet.

Q. Did you report Natalie for leaving residents wet?

A.  Yes.

Q. Okay. When did you report Natalie?

A. I believe it was in … 2014.

Q. Okay. Who did you report this to?

A.   To her team leader.

Q.  Who was her team leader?

A.  Denise.

Q. … Do you know what Denise did, if anything in response to that report?

A.  No

(Watkins Dep. 152: 17-24, 153: 1-5,14-16).

115.    Plaintiff was asked and answered the following questions regarding her work

environment:

Q. Are there any other reasons you believe your discharge was based on race?

A. Yeah, because I was isolated.

Q. What do you mean by that?

A. I was isolated by Lorely during dinner.  Dining room time Lorely, Virginia Perach, Choa, another nurse who Lorely had trained, and Nicole Rzyke, who worked in the dining room, would all sit at the table with Virginia.  There were five tables. One staff is supposed to be at each table. They all sat together. I sat at a table with my residents, and they talked about what they did. They would go out to restaurants after work. It was a clique.

Q.  How is that related to your race?

A.  … I was isolated from their conversations… I was treated indifferently…They were not associating with me. I was the only Black American in there. They'd talk with each other, but could not hold a conversation with me.

(Watkins Dep. 134: 16-24, 135: 1-8, 10-15).

116.    Plaintiff was asked and answered the following questions regarding her white co-

worker, Virginia Perhach:

A. When Marek hired Virginia and Mike back after I got terminated, she specified that Mike could not work in Memory Care with his wife anymore.

Q. Just to describe that time period when  Virginia and Michael, they had been working for Riverside, they left supposedly for a better life, … and then a few weeks later they returned to work at Riverside?

A. Yes

Q. …I believe you said a three-week period -- it was during that three-week period from the time that they left, before the time they returned to work?

 A. Yes.

(Watkins Dep. 234:24, 235:1-2, 19-24, 237:3-7).

**ARGUMENT**

## I.      Summary Judgment Standard

Summary judgment is only to be rendered if the non-moving party is unable to show a

genuine issue as to a material fact on which that party will bear the burden of proof at trial.

*Nebraska v. Wyoming*, 507 U.S. 584, 589, 113 S. Ct. 1689, 1694, 123 L.Ed.2d 317 (1993).  A

"genuine issue" exists where the evidence before the Court is of such a nature that a reasonable

jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 248-52, 106 S.Ct. 2505, 2510-12, 91 L.Ed.2d 202 (1986). While mere speculation, self-

interested assertions, and conclusory allegations are insufficient, district courts must review all

facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party.

*Smith v. Severn*, 129 F.3d 419,427 (7th Cir. 1997); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).    Plaintiff will show that genuine issues as to material facts exist for the elements to prove

race discrimination racial harassment as stated in her amended complaint.

## II.  Ms. Watkins' Race Discrimination Succeeds as a Matter of Law

The Seventh Circuit Court of Appeals has stated that to set forth a *prima **facie*** case

of race discrimination Ms. Watkins needs to show: (1) she is a member of a protected class; (2)

she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4)

the defendant treated similarly situated employees outside her class more favorably. *Ballance*

*v. City of Springfield,* 424 F.3d 614, 617 (7th Cir. 2005). Defendant does not dispute the first

element that Ms. Watkins, who is black, is a member of a protected class.

Ms. Watkins had worked for Defendant approximately six years, when she was

terminated in October 2014. The following facts illustrate how she was performing her job

satisfactorily when she was fired because of alleged patient abuse, which occurred on

September 30 or October 1, 2014.

Ms. Watkins testified that on September 30 or October 1, 2014, she went

into the room of Resident B,  an elderly resident with dementia, to get her to come out to dinner,

and Resident B agreed. As Ms. Watkins and Resident B headed down the hallway, Resident  B

started leaning back, saying "no." Ms. Watkins was holding Resident B's arm.

Ms. Diane Marek, Plaintiff's supervisor testified

that on October 2, 2014, she reviewed silent security camera footage of this  hallway incident

between Ms. Watkins and Resident B. During her deposition Ms. Marek was asked and

answered the following questions:

> Q.  As far as what you described [in the video] as Irene and Fran walking down the hall, did you notice anything unusual as you observed them walking down the hall?
> B.  Yes.
> Q. What did you observe?
> A. Fran had Irene's arm which that didn't -- that wasn't necessarily alarming, but as they were walking down the hall, you could tell that Irene was getting upset about something. I didn't know what, but you could tell she was getting upset, and then, she pulled her arm back…
> Q. So, when you observed Irene pulling her arm back, are you talking about Irene pulling her arm back or was it Fran's arm?
> A. No. It appeared like Fran was helping her down the hall and Irene pulled her arm away from Fran.
> Q. So, as far as Fran's conduct as it related to what you were reviewing with Irene, was there anything in addition to what you've already stated that you observed regarding Fran's conduct?
> A. No.

Based on the testimony of Plaintiff and what Ms. Marek stated she saw on the

video, specifically: "Fran was helping her down the hall and Irene pulled her arm away

from Fran", there was absolutely no misconduct on the part of Plaintiff in this incident; and

therefore, she performed her job satisfactorily.

Because it is undisputed that Plaintiff was terminated, the

only other element for Plaintiff's **prima** *facie* case of race discrimination is whether

Defendants treated similarly situated white employees more favorably. First, it is undisputed

that Ms. Marek did not terminate any white employees. In fact, she allowed Ms. Virginia

Perhach, who is white and who had the same position as Plaintiff, to return to work a few weeks

after she had left voluntarily.

In addition, Plaintiff provided solid evidence regarding how her white co-worker,

Ms. Natalie Mesovich or Mesewicz, was treated more favorably. Ms. Watkins was asked and

answered the following questions regarding Ms. Mesovich:

> Q. What about Natalie Mesovich? Why do you believe she was treated better than you?
> A.  Numerous co-workers reported Natalie for leaving residents wet.
> Q.  Did you report Natalie for leaving residents wet?
> A.  Yes.
> Q.  Okay. When did you report Natalie?
> A.  I believe it was in … 2014.
> Q.  Okay. Who did you report this to?
> A.   To her team leader.

Even with this clear evidence of misconduct, Ms. Mesovich was not terminated.

Further, Ms. Vicki Little, a co-worker of Plaintiff, stated the following in her

Certification of Statement:

> I was terminated by Ms. Marek in May 2014 because of my African American race. Ms. Marek said the reason for termination was because I made a medication error. I attempted to give a patient her meds but the patient was in the washroom. I told the patient I would come back at the end of the shift but I forgot. The patient was fine. In March 2014, Lorali (last name unknown), [who is] White, …, gave a patient the wrong medication. Lorali made sure to tell me in training that the appropriate procedure was to report the error, which she did. Lorali was never given any discipline for her med error.

In addition, Ms. Watkins testified that Riverside treated a CNA, Ashley Whittaker (White), more  favorably than her because in June 2014, Watkins reported to management that Ms. Whittaker left  residents in their beds wet or allowed them to walk around wet. Ms. Whittaker was not disciplined. Thus, there are at least four examples of white co-workers not being disciplined after clear violations of Defendants' policies. Based on these aforementioned facts, Plaintiff has clearly presented solid evidence of a *prima facie* case of race discrimination.

### III.    Defendant's Reason for Ms. Watkins' Termination Was a Pretext for Race Discrimination

Once a plaintiff has set forth a *prima facie* case of discrimination, the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for its actions. If the employer states such reasons, the burden shifts back to the employee to demonstrate  that they are merely pretext for discrimination. The Seventh Circuit Court Appeals described pretext as follows:

> In order to demonstrate a material issue of fact as to pretext, a plaintiff must show that either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible. Pretext is more than a mistake on the part of the employer; it is a phony excuse. Where a defendant has proffered more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons. However, [the court does] not "sit as a super-personnel department that reexamines an entity's business decisions." Instead, [it] looks to  "whether the employer gave an honest explanation of its behavior." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (citations omitted).

As previously stated Defendants' reason for terminating Ms. Watkins was her alleged misconduct, which was videotaped. Plaintiff asserts that this reason was a pretext or a "dishonest explanation" for race discrimination. This reason is dishonest because Ms. Marek, who made the decision to fire Ms. Watkins based on misconduct, admitted that the only alleged misconduct was when "Fran was helping her [patient] down the hall and Irene [ the patient] pulled her arm away from Fran." The act of a patient pulling away from a nurse certainly has nothing to do with patient abuse.

Further, it is clear that Ms. Perhach was dishonest when she wrote a statement as part of the investigation which let to Ms. Watkins' termination. Ms. Perhach stated that she:

> … witnessed Watkins pull Resident B's arm as she  led her down the hallway at the Memory Care facility…that she was in the hall when Resident B appeared to not want to go to the dining  room for meal time … she could see Resident B  resisting, Watkins aggressively pulling Resident B down the hall, and then Resident B broke free  from Watkins and ran back to her room.

Ms. Marek's testimony illustrated the dishonesty of Ms. Perhach. Ms. Marek contradicted Ms. Perhach when she was asked and answered the following questions:

> Q.  So, just to clarify, you described what you saw [on the video tape] regarding Irene and Fran, and we've also referred to you saw Virginia [Perhach]coming out of a door?
> A. Yes.
> Q.  So, as best as you can recall, did she [Virginia] come out of the door before or after Irene had pulled her arm -- I believe you said Irene pulled her arm away from Fran?
> A. It was after.
> Q.  … you described on the footage that  you saw where Irene was very close to Fran and  Irene had pulled her arm away from Fran, is that  correct?
> A. I didn't say that she was close to Fran. They were walking down the hall together, and Irene -- you could see Irene pull her arm away from Fran.
> Q.  So, at that point could you see where Virginia was?

A. No. I seen her come out the door after Irene was turning around to go back to her room.
Q.  So, regarding the footage that we've been describing from that day regarding Irene and Fran and Virginia…besides what you've described, was there anything else that you observed?
A. No.

Thus, because the video showed that Ms. Perhach was not in the hallway to see what Plaintiff

did, she was dishonest when she made a statement asserting that she saw Ms. Watkins

aggressively pulling Resident B down the hall. Moreover, Ms. Marek knew that Ms. Perhach was

lying in her statement based on the video she had seen- yet she still decided to terminate Ms.

Watkins.

IV.    **Ms. Watkins' Racial Harassment Claim Succeeds as a Matter of Law**

In *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594,600 (7th Cir. 2014)

755 F.3d 594,600, the Seventh Circuit stated:

> To survive summary judgment on a racially hostile work environment claim, an employee must provide sufficient evidence that demonstrates: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc*., 739 F.3d 972, 982 (7th Cir. 2014).

In the present case, Ms. Marek, Plaintiff's supervisor, called Ms. Watkins "trouble" on a daily

basis and asked her repeatedly, "Are  you staying out of trouble?"  In addition, Ms. Marek did not

call any of the white employees she supervised "trouble".   Further, at Ms. Watkins' deposition,

she was asked and answered the following questions:

Q.    Why do you believe her calling you trouble was based on your race?
A.    That's from my -- from my understanding, that's what is -- that's what white people refer to black people when they think that they are, I would say, lazy. It's a -- it's a slur, a slur.
Q.    Who told you that?
A.    I'm 58 -- 59 years old, and this isn't the first time I've seen people treated this way.
Q.    Okay. So, it's your testimony that calling somebody trouble is a racial slur?
A.    Yes.

This testimony from Ms. Watkins is both subjective because she believed the word "trouble" was a

racial slur; and objective because she stated that she has observed the word "trouble" used by

racist white people referring to black people- who are perceived to be lazy.

The following are two more examples illustrating that the word is objectively offensive. The first example shows how the word lazy can be a slur. In a 2012 article in the *National Review* written by Jack Fowler, he refers to a comment made by New Hampshire Governor John Sununu made concerning President Barack Obama in which Sununu stated that the President was lazy. In his article Fowler quoted a *Hartford Courant* columnist, Frank Harris. Harris wrote:

> [Sununu] … delivered a blow way below the belt and far across the racial line …
> In his smug delivery Sununu clearly knew what it meant to call someone black-the
> president no less-lazy. It is one of those racial stereotypes so often used over the
> years for Americans of African descent. (Exhibit 2, *National Review* article by Jack
> Article dates October 11, 2012)

The second example describes the history of the word "trouble" as a racial slur.

Matt Lee, a student at Elon University, published an article titled "The Manipulation and Role of Stereotypes in the Rush Hour Trilogy". Mr. Lee states:

> Most of the stereotypes in the [Rush Hour] film are suggested through dialogue and
> behavior… For example in Rush Hour 2, Lee [who is an Asian character in the movie]
> is able to run on a truck to avoid getting hit while Carter [who is black] rolls along the
> truck because he does not have kung-fu skills. This behavior, though comedic through
> the editing, portrays Lee as a skilled karate hero and accentuates Carter's reputation as
> the loud-mouthed, **trouble**-making sidekick… African -Americans received many
> positive and negative stereotypes in the Trilogy. [Carter's] character, with his loud
> talking and **trouble**-making nature, only perpetuated the stereotypical happy-go-lucky
> Negro of early 1900s Hollywood films. (Bold type added) (Exhibit 3, *Elon Journal of
> Undergraduate Research in Communications,* Vol. 7, No 2, Fall 2016)

The aforementioned evidence clearly shows that Ms. Watkins environment was not only subjectively and objectively offensive, but additionally it was based on Ms. Watkins being black. In addition, Ms. Marek's conduct was certainly pervasive because on daily basis she referred to Ms. Watkins as "trouble" or stated: "Are  you staying out of trouble?"

The last element Plaintiff needs evidence, to illustrate a racially hostile work

environment claim, is a basis for employer liability." In *Faragher City of Boca Raton*, 524 U.S.

775 (1998), the United States Supreme Court stated:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.

In the present case, Ms. Marek was not only Ms. Watkins' immediate supervisor, she additionally

made the decision to terminate Ms. Watkins.

## V.    CONCLUSION

Based on the facts and law, Plaintiff respectfully asserts that she has illustrated genuine

issues as to material facts exist for all key elements to prove race discrimination and as racially

hostile environment.

Respectfully submitted:

<u>s/ Mitchell A. Kline</u>
Attorney for Plaintiff
Law Office of Mitchell A. Kline
203 N. LaSalle Street, Suite 2100
Chicago, Illinois 60601

24